IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| KIMBERLY FASKING, HERBERT HICKS, and HEATHER LYNN BOOTH, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 2:18-cv-809-JTA (WO) |
| JOHN H. MERRILL, Alabama Secretary of State, in his official capacity, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On September 19, 2018, Plaintiffs Kimberly Fasking, Herbert Hicks and Heather

Lynn Booth filed a Complaint against Alabama Secretary of State John Merrill, in his

official capacity, seeking declaratory and injunctive relief under 42 U.S.C. § 1983. (Doc.

No. 1.) Plaintiffs allege that Defendant violated their First Amendment rights under the

United States Constitution by blocking them on his @JohnHMerrill Twitter account. The

parties have consented to the exercise of dispositive jurisdiction by a magistrate judge

pursuant to 28 U.S.C. § 636(c). (Docs. No. 14, 15.) Before the Court are the parties' cross

motions for summary judgment. (Docs. No. 37, 39.) The parties have stipulated to the facts

(Doc. No. 34) and agreed to submit this case on the pleadings (Doc. No. 54).

After careful scrutiny of the record and the briefs submitted by the parties, the Court

finds that Plaintiffs' motion for summary judgment (Doc. No. 37) is due to be GRANTED

IN PART AND DENIED IN PART and Defendant's motion for summary judgment (Doc.

No. 39) is due to be GRANTED IN PART AND DENIED IN PART.

## I.    JURISDICTION

This Court exercises subject matter jurisdiction over this lawsuit pursuant to 28

U.S.C. § 1331. The parties do not contest personal jurisdiction or venue, and the Court

finds sufficient allegations to support both in the Middle District of Alabama.

## II.    FACTS[1]

### A. The Twitter Social Media Platform

Twitter is a social media platform with more than 300 million active users

worldwide and over 70 million users in the United States. (Doc. No. 34 at ¶¶ 19-20.) The

Twitter platform allows users to publish short messages called "tweets," and to republish,

quote, or respond to others' messages. (*Id.* at ¶ 21.)

A Twitter "user" is an individual person, a business, a corporation, or an association

that has created an account on the platform. (*Id.* at ¶ 23.) Each Twitter account includes a

"handle," which is an "@" symbol followed by a unique identifier. (*Id.* at ¶ 29.) Near the

handle is a clickable icon that invites others to "tweet to" the user. (*Id.* at ¶ 30.) Users can

post "tweets," short messages up to 280 characters in length, to a page on Twitter that is

attached to the user's account. (*Id.* at ¶¶ 24, 26.) Tweets may also include photographs,

videos, or links to other internet web pages. (*Id.* at ¶ 25.) A user's page may also include a

short biographical description. (*Id.* at ¶ 31.) A Twitter page displays all tweets generated

---

[1] These facts are presented as stipulated to by the parties (Doc. No. 34) or as represented in uncontradicted summary judgment exhibits and affidavits submitted by the parties.

by the user, with the most recent tweets appearing first. (*Id.* at ¶ 26.) This display of tweets is known as a user's "timeline." (*Id.*)

In addition to publishing tweets, Twitter users can engage with one another in a variety of ways. (*Id.* at ¶ 39.) A Twitter user can reply to other users' tweets. (*Id.* at ¶ 41.) The reply will appear on the original user's feed in a "comment thread" under the tweet that prompted the reply. (*Id.* at ¶ 43.) Other users' replies to the same tweet will appear in the same comment thread. (*Id.*) Second-level replies (replies to replies to the original tweet) will also appear in the comment thread. (*Id.* at ¶¶ 44, 50-51.) The comment threads reflect multiple overlapping conversations among and across users and are a large part of what makes Twitter a social media platform. (*Id.* at ¶¶ 44, 52.)

Users can also "retweet" (i.e., republish) other users' tweets by either publishing the other users' tweets to their own timeline or by quoting them in their own tweets. (*Id.* at ¶ 39.) Users can "mention" other users in a tweet by including the other user's twitter handle in the tweet, which prompts a notification to the mentioned user that they have been mentioned in a tweet. (*Id.* at ¶¶ 45, 54.) Twitter users can subscribe to other users' messages by "following" those user's accounts. (*Id.* at ¶ 36.) Twitter users see all tweets posted or retweeted by accounts they have followed in a display often referred to as the user's "feed." (*Id.* at ¶ 37.)

Unless the user has set up his or her account to be private, Twitter webpages are visible to everyone with internet access, including those who are not Twitter users. (*Id.* at ¶ 34.) Anyone who can view a user's public Twitter page can see the user's timeline,

although to utilize Twitter features that facilitate interaction with other users, one must be a Twitter user and be logged in to one's Twitter account. (*Id.* at ¶¶ 28, 35, 66.)

Twitter users can "block" other specific users, which prevents the blocked user from viewing and interacting with the blocking user's page while the blocked user is signed in to their own account. (*Id.* at ¶¶ 45, 62.) A block also prevents the blocking user from viewing the blocked user's tweets. (*Id.* at ¶ 63.) If the blocked user attempts to follow the blocking user, or to access the Twitter page from which the user is blocked, the user will see a message indicating that the other user has blocked him or her from following the blocking account and viewing the tweets associated with the blocking account. (*Id.* at ¶ 64.) Twitter provides users with the ability to block other users, but it is the users themselves who decide and control whether other users are blocked from interacting with their pages. (*Id.* at ¶ 60.)

## B. Defendant's @JohnHMerrill Twitter Account

Defendant is Secretary of State of the State of Alabama. (Doc. No. 34 at ¶ 2.) Defendant operates and/or oversees the operation of a Twitter account with the handle @JohnHMerrill, which has over 7,500 followers, and through which he has tweeted over 17,000 times. (*Id.* at ¶¶ 31, 76, 78.) This account's tagline reads "Representing the People of Alabama as their 53rd Secretary of State." (*Id.* at ¶¶ 3, 31.) The account also provides a link to Defendant's website, johnhmerrill.com. (*Id*. at ¶ 31.) Defendant established the account in 2009,[2] prior to being elected Secretary of State, and he currently uses it as a way

---

[2] The parties' joint stipulation of facts does not state when Defendant became Secretary of State or for what purpose he used the account prior to becoming Secretary of State. Defendant's

of communicating with the public about "the administration of the Alabama Office of the Secretary of State[,] among other issues of interest to him or his followers." (*Id.* at ¶¶ 4, 5, 90; Doc. No. 23-1.) Defendant uses his own personal electronic devices to manage the account. (Doc. No. 23-1.) The @JohnHMerrill account is verified by Twitter and bears a blue badge indicating that fact. (Doc. No. 34 at ¶ 93.) At all times relevant to this case, the blue badge on the @JohnHMerrill account signified that Twitter considered the account to be authentic and of public interest. (*Id.* at ¶ 94.)

"Defendant . . . uses his Twitter account on an almost daily basis for communicating and interacting with the public." (*Id.* at ¶ 91.) "Twitter users sometimes direct questions regarding voting and elections to [Defendant] in his capacity as Secretary of State by tweeting to the @JohnHMerrill account," and Defendant "sometimes answers those questions using the @JohnHMerrill account." (*Id.* at ¶ 95.) When other Twitter users reply or interact with one of Defendant's tweets, it is clear that user's reply or interaction comes from them and not from Defendant. (*Id.* at ¶ 74.) The contents of a user's likes, retweets, and other interactions with Defendant's @JohnHMerrill account are controlled by the user who created them, not by Defendant. (*Id.* at ¶ 75.)

Defendant does not take any measures to prevent the public at large from seeing or interacting with his @JohnHMerrill Twitter account, and the account is accessible to the

---

summary judgment brief contains some unsworn statements of counsel regarding Defendant's use of the @JohnHMerrill account prior to Defendant becoming Secretary of State. However, "[s]tatements of fact in a party's brief, not in proper affidavit form, cannot be considered in determining if a genuine issue of material fact exists." *Helmich v. Kennedy*, 796 F.2d 1441, 1443 (11th Cir. 1986).

public without regard to political affiliation or any other limiting criteria. (Doc. No. 34 at ¶¶ 68-70.) The only Twitter users who cannot follow and/or interact with the @JohnHMerrill account are Twitter users whom Defendant has blocked. (*Id.* at ¶¶ 72, 77, 79-80.) Defendant has blocked some individual users, and when he does so, those users cannot converse on Twitter with other non-blocked users in the interactive space created on Defendant's account. (*Id.* at ¶ 72.)

Defendant's @JohnHMerrill account "contains photographs of [Defendant] interacting with the public as Secretary of State, announcing decisions as Secretary of State, holding press conferences as Secretary of State" in the Secretary of State's office, "and meeting with many public officials in the performance of his official duties as Secretary of State." (*Id.* at ¶ 82.) "Defendant . . . uses the @JohnHMerrill account to announce, describe, and defend his policies." (*Id.* at ¶ 83.) He also uses the @JohnHMerrill account to "publicize visits to constituents," "for fund-raising events," and "for political events."[3] (*Id.* at ¶¶ 85-87.)

Defendant also sometimes uses his @JohnHMerrill account to "announce official decisions and government business." (*Id.* at ¶ 84.) In fact, he sometimes "uses the @JohnHMerrill account to announce official Secretary of State decisions and policies before those decisions and policies are announced through other official channels." (*Id.* at ¶ 88.)

---

[3] The parties' stipulation of facts does not indicate specifically whose "fund-raising events" and "political events" the @JohnHMerrill account is used for, or how the account is used for those events.

The parties' stipulation of facts contains some specific examples of Defendant's use of his @JohnHMerrill Twitter account. For instance, using the @JohnHMerrill account, Defendant tweeted photographs of himself working in his office or in meetings with others, along with messages such as the following:

> I was delighted to be interviewed by @ABC today concerning our plan to utilize the new resources available to us through the latest distribution of Help America Vote Act $! It is important that these resources be utilized to benefit all citizens in the area of election security!

(*Id.* at ¶ 28 (sic).)

> It is always good to meet community leaders like Karen Jones from Montgomery who stopped by the office today to pick up a number of voter registration applications so she can encourage people to become registered voters. Please remember to use Vote For Alabama App when possible!

(*Id.* at ¶ 28.)

> It was a great night at Temple Baptist Church in Cullman where I had the privilege to speak to the members of the Cullman County Citizens Academy at their graduation! This program, coordinated by the Cullman County Sheriff's office, is one of the finest in the state!

(*Id.* at ¶ 31.)

> I was delighted to be back in Tuscaloosa yesterday and have a chance to visit with @LynnBrooks of @wvua23 to discuss the elections and election administration! They do a tremendous job of keeping West Alabama informed!

(*Id.* at ¶ 33.)

Defendant also used the @JohnHMerrill account (without an accompanying photograph) to tweet the following message to voters on December 7, 2017:

> Today is the last day to request an absentee ballot! Your request must be received by our absentee election manager today in order to receive an absentee ballot. If you have any questions about the election, please contact

us at [Secretary of State's office telephone number redacted] or visit
Alabamavotes.gov.

(*Id.* at ¶ 33.)

Defendant's Twitter account includes a number of other announcements about his
public speaking engagements around the state, including a speech to students about "the
importance of voter registration and photo IDs," a speech to the Sheriffs' Association, a
speech to the Alabama Circuit Clerks' Association (accompanied by the comment, "The
effort of these election officials is paramount to the success of the process!"), the Alabama
Association of Registrars (accompanied by the comment, "I am thankful for their efforts
in registering 1,145,844 new voters!"), and the Republican National Lawyers'
Association's Election Law Seminar (accompanied by the comment, "I was excited to tell
them about the many outstanding accomplishments we have produced in voting and
elections in Alabama!"). (Doc. No. 37-1 at ¶¶ 4.a, 4.b., 4.d., 4.f., 4.i., 4.j.) The majority of
these announcements were accompanied by photographs of Defendant posed with other
individuals at the speaking engagements.

Defendant has retweeted posts on his timeline related to his work, statements, and
policies as Secretary of State. For example, Defendant retweeted a tweet and stated,
"Alabama is working again thanks to @GovernorKayIvey and the Republican legislature.
Vote Republican in November and keep the progress going." (*Id.* at ¶ 40.) The retweeted
tweet, in turn, referred to a tweet from AL.com stating Alabama's unemployment rate was
"unchanged at 4.1 percent, and a record number of people are working!" (*Id.*)

Another time, Defendant retweeted the tweet of another user with the handle "The Truth Gazette" (@TruthGazetteAL), which stated:

> Alabama Secretary of State John Merrill's Statement (GIVEN DIRECTLY TO THE TRUTH GAZETTE) on the NEW P.E. Standards for Alabama State Schools. Banning Dodgeball, Kickball, and more! @JohnHMerrill.

(Doc. No. 34 at ¶ 28.)

Attached to Truth Gazette's tweet was this embedded quote: "'I think those sports are good sports to introduce in elementary and high school and that a number of students learn valuable lessons from those opportunities to compete.' – John Merrill[,] AL's Secretary of State." (*Id*.)

Defendant has also used his Twitter account to interact with other Twitter users who reply to his tweets or who mention him in tweets. In August 2017, Defendant tweeted: "Being inactive does not affect an individual's ability to vote if they update their information[,] which they can do on election day." (Doc. No. 37-1 at ¶ 4.c.) A Twitter user replied to Defendant's tweet with the following question: "But how could i have been moved to inactive when I've voted in every election in the past 18 yrs at same polling place?" (*Id*. (sic).) Defendant replied, "Because there were two cards that were mailed to your home that were not received by anyone and when they were returned you became inactive." (*Id*.) The other Twitter user then proceeded to ask additional questions via tweet about the cards that were supposedly mailed to her and which she said she did not receive, and Defendant tweeted back that the user should "ask the United States Postal Service that question." (*Id*.)

In July 2018, a Twitter user with the handle @brandaundean accused Defendant of harassing voters and "hav[ing] an issue with poor Black People casting votes." (*Id.* at ¶ 4.e. (sic).) Defendant tweeted back:

> You are a criminal! That has been well documented! We will continue to work to uncover all evidence that is available in your case and we will hunt you down and we will prosecute you to the fullest extent of the law for the crimes you have committed against the people in Brighton[.]"

(*Id.* (sic).)

In August, 2018, Defendant tweeted a link to a news article regarding a viral video about election equipment being easily hacked. (*Id.* at ¶ 4.g.) In his tweet, Defendant provided the following comment on the article:

> Preserving election integrity is paramount to the success of our election process! However, this depiction of unbridled and unfettered access to election equipment, which is not even in use in the state of Alabama, is completely unrealistic.

(*Id.*)

In October 2018, a user with the handle @jennifergarlen tagged @JohnHMerrill in a tweet stating that "@JohnHMerrill needs to hear from you, Twitter." (Doc. No. 34 at ¶ 9.) The @jennifergarlen tweet stated that "our GOP Secretary of state wants to fight with awesome Dem Congressional candidate @HaganforHouse and with ME for calling him out on his lies." (*Id.*) Defendant replied to @jennifergarlen's tweet with a tweet of his own from the @JohnHMerrill account:

> If you want to talk about the issues you need to call me on my cell phone at [number redacted] instead of begging for all your liberal snowflake friends to try to jump on me on Twitter. That's how all you clowns get blocked in the first place.

(*Id.*)

User Amanda L. Scott (@AmandaLScottDC) then replied to both @JohnHMerrill and @jennifergarlen with a tweet that included the comment, "This tweet is not befitting of a state elected official." (*Id.*)

The parties stipulate that Defendant also uses the @JohnHMerrill account "on occasion, to communicate about other issues not directly related to official government business." (*Id.* at ¶ 5.)

In their stipulation, the parties incorporated by reference "all tweets posted as of the date of this Stipulation to the @JohnHMerrill account since 2007" and "all available header images and profile photos used on the @JohnHMerrill Twitter web page [from] 2007 to the date of this stipulation."[4] The parties indicated that they would jointly submit an exhibit containing all such tweets and headers, but they did not, and so those tweets, profile photos, and headers are not properly before the Court on summary judgment.

## C. The Secretary of State's @alasecofstate Twitter Account

The Secretary of State's office maintains a separate Twitter account with the handle @alasecofstate. (*Id.* at ¶ 96.) The @alasecofstate account presents itself as the "Official Twitter account of the Office of Alabama Secretary of State @JohnHMerrill" with the @JohnHMerrill account tagged in the account's description. (*Id.* at ¶ 99.) Defendant has stated that he "never tweets from" the @alasecofstate account, which Defendant does not

---

[4] It is not clear why the parties suggest here that the @JohnHMerrill account has been active since 2007, when they stipulated that the account came into existence in 2009. (Doc. No. 34 at ¶ 4.)

administer, and which is maintained by the Secretary of State's office solely through staff members. (*Id.* at ¶¶ 96, 98.) The @alasecofstate account frequently republishes the @JohnHMerrill account's tweets, and the @JohnHMerrill account frequently republishes @alasecofstate tweets. (*Id.* at ¶ 97.) The @alasecofstate account also routinely tags the @JohnHMerrill account when referencing Defendant. (*Id.* at ¶ 98.)

## D. Other Information Pertaining to Defendant's Administration of His Social Media Accounts

On Thursday, May 24, 2018, Defendant's Chief of Staff, John Bennett, sent an email to journalist Brad Friedman with a message "from Secretary Merrill" that stated:

> I will continue to use my social media forums the way that I have utilized them in the past. They will not be utilized by other users to express their political views or promote their agendas. If someone is unable to reach me through social media, they are always welcome to contact me at the office at [number redacted]. That is the most efficient and preferred way to contact me.

(*Id.* at ¶ 6.)

In a news report from AL.com,[5] reporter Mike Cason reported that Defendant "says he won't allow people to use his social media accounts to promote causes he opposes or undermine the work of him and his staff in voter registration and the pursuit of voter fraud." (*Id.* at ¶ 7.) According to the AL.com article, Defendant also made the following statement:

> Well, I always stick with the facts[.] . . . Most of these people are trolls. They're not interested in the facts. They're interested in using my platform to promote their position, whatever it is. Most of the time it's a very liberal position that is trying to bring attention to something that they think is important to them. And I don't really care what they want to do. But when

---

[5] The parties' stipulation of facts does not include the date of the AL.com article.

they want to use my platform to promote their issue, I've got a problem with that.

(*Id.*)

An article from the Montgomery Advertiser [6] reported the following:

Merrill, who is infamous for blocking those who disagree with him as well as those he calls "trolls" on Twitter, said he will continue removing followers from his digital presence if he feels so inclined.

I'm not unblocking anybody I've already blocked, because there's a reason those people were blocked. Anyone else that I feel needs to be blocked in the future will also be blocked. Anybody who wants to contact me can call me on my cellphone at [number redacted]. Because I work for the people of Alabama. Roll Tide.[7]

(*Id.* at ¶ 8.)

## E. Defendant Blocked Plaintiffs from the @JohnHMerrill Account

In November, 2017, Defendant blocked all three Plaintiffs from the @JohnHMerrill account. (*Id.* at ¶¶ 10-17.) Plaintiff Kimberly Fasking was blocked after questioning Defendant about crossover voting. (*Id.* at ¶¶ 10-12.) Plaintiff Herbert Hicks was blocked after he asked Defendant who extended him an invitation to speak at a ceremony commemorating the 51st Anniversary of Bloody Sunday in Selma, Alabama. (*Id.* at ¶¶ 13-15.) Plaintiff Lynn Booth was blocked after tweeting about a typographical error on an Alabama election ballot. (*Id.* at ¶¶ 16-17.) In addition to blocking Booth, Defendant stated that she was promoting "fake news." (*Id.* at ¶ 17.)

---

[6] The parties' stipulation of facts does not include the date of the Montgomery Advertiser article.

[7] "Roll Tide" is a statement commonly used by fans of the University of Alabama to indicate their support for the school, especially its sports programs.

Defendant stipulates that he will not contest Plaintiffs' allegation that he blocked Plaintiffs from the @JohnJMerrill Twitter account because they posted tweets that were directed at him and that concerned election law, criticized him, or included comments with which he disagrees. (*Id.* at ¶ 1.)

Because they are blocked, Plaintiffs are unable to view Defendant's @JohnHMerrill tweets while they are logged in to their own Twitter accounts. (*Id.* at ¶¶ 18, 79.) However, Plaintiffs can view tweets by @JohnHMerrill if they are using an internet browser or other application while they are not logged in to their own Twitter accounts. (*Id.* at ¶ 80.) Because they are blocked, Plaintiffs are also unable to directly reply to Defendant's @JohnHMerrill tweets or participate in the comment threads associated with Defendant's @JohnHMerrill Twitter account. (*Id.* at ¶¶ 18, 79.) They cannot access the @JohnHMerrill page to view the comment threads associated with the @JohnHMerrill tweets while logged in to their accounts. (*Id.* at ¶ 79.)

### III. PROCEDURAL HISTORY

On September 19, 2018, Plaintiffs filed a Complaint against Defendant pursuant to 42 U.S.C. § 1983, alleging that, in blocking them on Twitter, Defendant violated their First Amendment rights by imposing a viewpoint-based restriction on their participation in a public forum, imposing a viewpoint-based restriction on their ability to access official statements of the Secretary of State, and imposing a viewpoint-based restriction on their ability to petition the government for a redress of grievances. (Doc. No. 1 at ¶¶ 49-52.) Plaintiffs seek a judgment declaring that Defendant violated the United States Constitution when he blocked them on Twitter. (*Id.* at ¶ 1.) They also seek an injunction requiring

Defendant to unblock them and prohibiting him from blocking them or other Twitter users from the @JohnHMerrill account on the basis of viewpoint discrimination. (*Id*. at 2.) Finally, they seek an award of costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

On November 12, 2018, before filing an answer, Defendant filed a motion for summary judgment, arguing that his Twitter account is a personal account that is not owned or controlled by the government. (Doc. No. 12.) On August 28, 2019, the Court denied Defendant's motion on grounds that "the sparse summary-judgment record submitted by [Defendant] is insufficient to support his motion." (Doc. No. 28 at 1.) The Court stated that Defendant would be permitted to renew his motion when the record was more fully developed. (*Id*.)

On September 13, 2019, upon the agreement of the parties, the Court entered a scheduling order setting forth deadlines for the parties to submit an agreed stipulation of facts and for the filing of summary judgment motions. (Doc. No. 38.)

On September 24, 2019, Defendant filed an Answer to the Complaint. (Doc. No. 33.) On November 5, 2019, the parties filed their agreed stipulation of facts. (Doc. No. 34.) On November 12, 2019, Plaintiffs filed a motion for summary judgment. (Doc. No. 37.) On December 29, 2019, Defendant filed a renewed motion for summary judgment. (Doc. No. 39.)

On May 20, 2020, Plaintiffs filed a motion to submit the case on the pleadings, requesting that the Court decide the case based on the parties' stipulation of facts and the summary judgment briefing. (Doc. No. 51.) On September 9, 2022, Defendant notified the

Court in writing that he did not oppose the motion to submit the case on the pleadings. (Doc. No. 53.) On September 10, 2020, the Court entered an order granting the motion to submit the case on the pleadings and stating that "[t]his case is under submission on the pleadings." (Doc. No. 54.)

## IV.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Palm v. United States*, 904 F. Supp. 1312, 1314 (M.D. Ala. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-324. A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to

16

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson*, 477 U.S. at 255.

After the nonmoving party has responded to the motion for summary judgment, the Court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e). As stated by the Court in *Celotex*, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial," the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 322.

The existence of cross-motions for summary judgment does not affect the applicable Rule 56 standard. *U.S. Aviation Underwriters, Inc. v. Yellow Freight Sys., Inc.*, 296 F. Supp. 2d 1322, 1330 (S.D. Ala. 2003) (citing *Gerling Global Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001)). The Court considers each motion separately, resolving all reasonable inferences against the party whose motion is under consideration, and need not necessarily grant one motion or the other. *See id.* ("'[C]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.'" (quoting *U.S. v. Oakley*, 744 F. 2d 1553, 1555 (11th

Cir. 1984))). The existence of cross-motions, however, may indicate the parties' belief that there is agreement on the material facts. *Id.*

## V.    DISCUSSION

**A. Introduction**

42 U.S.C. § 1983 provides for civil remedies, including declaratory and injunctive relief, against "[e]very person"[8] who, under color of state law, deprives a citizen or other person under the jurisdiction of the United States of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Plaintiffs allege that, in blocking them, Defendant acted under color of state law and unconstitutionally burdened their constitutionally-guaranteed free speech rights. The First Amendment's Free Speech Clause "constrains governmental actors and protects private actors." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1926 (2019). "Although the text of the First Amendment states that 'Congress shall make no law . . . abridging the freedom of speech . . .' the Amendment applies to the States under the Due Process Clause of the Fourteenth Amendment." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1 (1996). Thus, the issue at the heart of this case is whether, in blocking Plaintiffs from the @JohnHMerrill Twitter account, Defendant's actions were "under color of state law" and attributable to the State of Alabama.

---

[8] "[A] state official sued in his official capacity is a person for purposes of § 1983 when prospective relief, including injunctive relief, is sought." *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995).

Before reaching the government-action issue at the heart of Plaintiffs' free speech claims, however, the Court will first address threshold issues raised by the parties: (1) whether the government speech doctrine precludes application of the Free Speech Clause; (2) whether Plaintiffs' speech is protected by the First Amendment; (3) whether Defendant's decision to block Plaintiffs was content- and viewpoint-neutral; and (4) whether applying the public forum doctrine is consistent with the purpose and use of the @JohnHMerrill Twitter account. Then, as a key component of determining the propriety of applying the public forum doctrine, the Court will address whether Defendant's control of the @JohnHMerrill Twitter account, including use of its blocking function to block Plaintiffs, is properly attributable to the State. *See Knight First Amend. Inst. at Columbia Univ. v. Trump* (*Knight I*), 302 F. Supp. 3d 541, 567-68 (S.D.N.Y. 2018) (noting that "the standards for whether an action was taken 'under color of state law' and for whether an action constitutes 'state action' are identical" and that "the requirement of state action in the forum context is not usually analyzed separately (either in general or under the *West*[9] standard specifically) from the government control-or-ownership requirement" of the public forum analysis), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *cert. granted, judgment vacated as moot sub nom. Biden v. Knight First Amend. Inst. At Columbia Univ.*, 209 L. Ed. 2d 519 (2021); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982) ("[I]n a § 1983

---

[9] *West v. Atkins*, 487 U.S. 42, 49 (1988) ("The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941))).

action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical.").

In addition to their claims that Defendant has unconstitutionally burdened their freedom of speech by preventing them from participating in a public forum, Plaintiffs also allege that Defendant has unconstitutionally interfered with their ability to access official government statements and with their right to petition the government. The Court will address those claims last.

**B.     The Government Speech Doctrine Does Not Preclude Application of the Free Speech Clause**

"The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). "A government entity has the right 'to speak for itself,'" "to say what it wishes," and "to select the views that it wants to express*." Id*. (quoting *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 229 (2000)). The government's right to control its own message can extend even to removing or refusing to allow speech of which it disapproves. *Mech v. School Board of Palm Beach Co., Fla.*, 806 F.3d 1070, 1074 (2015); *see Leake v. Drinkard*, 14 F.4th 1242, 1253 (11th Cir. 2021), *cert. denied*, 212 L. Ed. 2d 538 (2022) (holding that the Sons of Confederate Veterans did not have a constitutional right to force the city to allow them to carry Confederate battle flags in the city's parade honoring American veterans). Because characterizing speech as government speech "'strips it of all . . . protection'" of the Free Speech Clause, courts "do not do so

lightly." *Mech.*, 806 F.3d at 1074 (quoting *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 221 (2015) (Alito, J. dissenting)).

Defendant contends that the Free Speech Clause is inapplicable here because, if[10] his operation of the @JohnHMerrill account was attributable to the state, then, in blocking Plaintiffs, he was merely using his Twitter account administration powers for curating government speech by prohibiting views that he wished not to express on behalf of the state. *See Pleasant Grove*, 555 U.S. at 468 (holding that the government may limit "'what is or is not expressed'" even when it enlists private parties to convey its own government-controlled message).

Plaintiffs concede that Defendant's own tweets from the @JohnHMerrill account are government speech. However, the parties stipulate that "[t]his case is about [Defendant's] supervision of the interactive features of the [@JohnHMerrill] account, not just the initial tweet[s] by Defendant." (Doc. No. 34 at ¶ 73.) Plaintiffs maintain that they are engaging in their own speech when they use those interactive features by replying, responding, and reacting to Defendant's tweets, and by interacting with other Twitter users about the @JohnHMerrill account. Therefore, they argue, the government speech doctrine offers Defendant no cover for using his Twitter account's blocking tool to interfere with their ability to freely express their own messages.

---

[10] Defendant does not concede that his operation of the @JohnHMerrill account is fairly attributable to the state. He argues only that, *if* he acted on behalf of the government in operating the @JohnHMerrill account, then his use of the account would amount to government speech.

In *Mech*, the Eleventh Circuit articulated a three-factor test, [11] derived from Supreme Court case law, that can be used "for separating government speech from private speech"[12] when determining whether speech is subject to the state's prerogative to limit and control its own message. *Mech*, 806 F.3d at 1074-75; *see also Leake*, 14 F.4th at 1248 ("What makes speech government speech? Although we lack a 'precise test,' there are three factors we use to distinguish government speech from private speech: history, endorsement, and control." (quoting *Mech*, 806 F. 3d at 1074)).

The first *Mech* factor requires the Court to consider whether "the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the government." *Id*. at 1232 (quoting *Walker*, 576 U.S. at 211). Although "a medium that has long communicated government messages is more likely to be government speech," a medium's novelty does not preclude a finding of government speech. *Mech*, 806 F. 3d at 1075-76. "[A] particular medium may be government speech based solely on present-day circumstances." *Id*. at 1076. It is not uncommon for governments to use their own social media posts for disseminating their own messages.[13] However, Defendant has cited no

---

[11] In *Mech*, the court noted that the three factors it considered were "not exhaustive" and might not be "relevant in every case." *Mech*, 806 F.3d at 1075. The factors used in *Mech* are relevant here, as Defendant recognized when citing them in his brief. (Doc. No. 39 at 9.)

[12] The parties have not proposed that the *Mech* test should be used for separating or distinguishing government speech from private speech in the context of whether a public official has converted a formerly private social media account to a public one, or in the context of whether an official's operation of a social media account can be fairly attributed to the state. Therefore, the Court will not consider *Mech* or related cases for that purpose in this case.

[13] *See. e.g., Mech*., 806 F. 3d at 1076 (recognizing that a School Board may engage in government speech by posting a message of its own on Facebook or Twitter); *Charudattan v. Darnell*, 834 F.

history, however brief, whereby governments have expressed themselves via the unsolicited, unadopted, unendorsed responses and interactive social media activities of the public at large. This factor weighs against a finding of government speech.

The second *Mech* factor is whether "observers reasonably believe the government has endorsed the message" in question.[14] *Id.* The parties stipulate that, "[w]hen a reply is posted to one of Defendant['s] . . . tweets[,] it is clear that [the] message in the reply is coming from that individual user, not from the Secretary of State," that "[t]he contents of retweets, replies, likes, and mentions are controlled by the user who generates them and not by the Secretary of State, except to the extent he attempts to do so by blocking," and that "[n]o other Twitter user can alter the content of any retweet or reply, either before or after it is posted." (Doc. No. 34 at ¶¶ 55-56, 74-75.) When another user, such as @JohnHMerrill, wishes to indicate agreement with others' posts, they can do so by liking, retweeting, commenting, etc. (Doc. No. 34 at ¶¶ 39-41, 53-54.) Reasonable observers would understand that Plaintiffs' posts, comments, or other interactive activities are not those of the @JohnHMerrill account and are not endorsed by Defendant or the @JohnHMerrill account unless Defendant has affirmatively indicated otherwise using the Twitter tools available to him as the owner and administrator of the @JohnHMerrill account. This factor weighs heavily against applying the government speech doctrine.

---

App'x 477, 479-81 (11th Cir. 2020) (sheriff's office's use of a social media page); *Robinson v. Hunt County, Tx.*, 921 F.3d 440 (5th Cir. 2019) (same).

[14] In summary judgment briefing, Defendant does not discuss this factor, but Plaintiffs do. (Doc. No. 37 at 3; Doc. No. 39 at 8-10; Doc. No. 40 at 9-12.)

The third *Mech* factor is whether the government controls the message. Again, the parties have stipulated that control of the message conveyed in comments, retweets, replies, likes, mentions, etc., is solely vested in the user who generates them, and no other Twitter user can alter them. (Doc. No. 34 at ¶¶ 55-56, 74-75.) Thus, Plaintiffs, not Defendant, control the messages they express by their Twitter interactions with the @JohnHMerrill account. This factor, too, weighs against applying the government speech doctrine.

Accordingly, upon consideration of the undisputed facts and the applicable law, the Court concludes that, as a matter of law, the government speech doctrine does not shield Defendant's conduct from the requirements of the Free Speech clause. *Cf. Knight First Amend. Inst. at Columbia Univ. v. Trump* (*Knight II*), 928 F.3d 226, 239-40 (2d Cir. 2019) (holding that "while the [government official]'s tweets can accurately be described as government speech, the retweets, replies, and likes of other users in response to his tweets are not government speech under any formulation."), *cert. granted, judgment vacated sub nom., Biden v. Knight First Amend. Inst. At Columbia Univ.*, 209 L. Ed. 2d 519 (2021).

## C. The Speech in Which Plaintiffs Engaged, and in Which They Seek to Engage, is Protected by the First Amendment

Plaintiffs argue that the speech in which they engaged (and in which they seek to engage) is political speech, which lies at the core of First Amendment protection. (Doc. No. 37 at 21.) "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs," including "discussions of candidates, structures and forms of government, the manner in which

government is operated or should be operated, and all such matters relating to political processes." *Mills v. Alabama*, 384 U.S. 214, 218-19 (1966).

The speech in which Plaintiffs engaged (and seek to engage) falls squarely within the realm of protected political speech. Before Defendant blocked them, Plaintiffs were commenting on matters relating to the political process or about events Defendant attended in his official capacity as Alabama's Secretary of State. (Doc. No. 34 at ¶¶ 10-18.) The parties stipulate that Defendant blocked Plaintiff Fasking "because of her questioning him about crossover voting." (Doc. No. 34 at ¶ 12.) Defendant blocked Plaintiff Hicks after Plaintiff Hicks "asked [Defendant] who extended [him] an invitation to speak at ceremonies related to the 51st [a]nniversary of Bloody Sunday." (Doc. No. 34 at ¶ 15.) Defendant blocked Plaintiff Booth "after [she] tweeted about a typographical error on an Alabama election ballot." (Doc. No. 34 at ¶ 17.) Plaintiffs want to continue to participate in discussion with other members of the Twitter-using public in the interactive space associated with @JohnHMerrill's tweets about official matters, including elections. (*See* Doc. No. 1 at ¶¶ 49-53.) In short, Plaintiffs seek to engage in the "free discussion of governmental affairs," *Mills*, 384 U.S. at 218, and were blocked from doing so because of their speech concerning the very act of voting itself, as well as Defendant's activities as a government official. Plaintiffs' speech falls within the free speech protections of the First Amendment.

**D.     Defendant's Reasons for Blocking Plaintiffs Were Not Viewpoint- or Content-Neutral and Do Not Satisfy Strict Scrutiny**

Defendant argues that Plaintiffs' speech is not entitled to protection under the First Amendment because that speech was not meant to further discussion, but merely to harass, annoy, and disseminate false information. (Doc. No. 39 at 17-18.) He alleges, without citing evidence, that he blocked them because their "argumentative" posts "disrupted [Defendant's] social media page" and "prevented [Defendant] from accomplishing his business – informing the public of his activities, interests, and accomplishments." (*Id*. at 19-20.) Defendant argues that blocking Plaintiffs was, therefore, a reasonable content- and viewpoint-neutral limitation on speech. (*Id*.) *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (holding that, "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech" if those restrictions are content-neutral, narrowly tailored to serve a significant governmental interest, and leave available ample alternative channels for communication); *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.").

Defendant's argument fails on the record because it is wholly unsupported by the uncontradicted evidence. The parties have not submitted to this Court the exact contents of the Twitter exchanges between the parties. All the record contains is the parties' stipulation of facts, which includes no evidence of repetitive questions, misinformation, harassment,

or intent to annoy on Plaintiffs' part,[15] no evidence that Plaintiffs' tweets posed any danger of disrupting the @JohnHMerrill social media page, and no evidence that Plaintiffs' tweets prevented Defendant from using the @JohnHMerrill account for its intended purposes. In fact, Defendant himself stipulated that "he will not contest Plaintiffs' allegation that the Plaintiffs were blocked from the @JohnHMerrill Twitter account because the Plaintiffs posted tweets in which they engaged him concerning election law, criticized him, or made comments with which Defendant disagrees." (Doc. No. 34 at ¶ 1.) Defendant's own admissions belie his contention that he was acting without regard to the content or viewpoints contained in Plaintiffs' tweets. The uncontradicted evidence establishes that Defendant's decision to block Plaintiffs was viewpoint- and content-based. He blocked them for the content of their posts (engaging him concerning election law) and the viewpoints they expressed (through critical statements and statements with which Defendant disagrees). (*Id.*)

Defendant also argues that any content-based blocking of Plaintiffs was permissible, but that argument also fails. Defendant relies on the principle that government may control access to a nonpublic forum "'based on subject matter and speaker identity'" if the control is "'reasonable in light of the purpose served by the forum and [is] viewpoint neutral.'" *Knight II*, 302 F. Supp. 3d at 575 n.22 (quoting *Cornelius*, 473 U.S. at 806). However,

---

[15] The parties stipulate that, when blocking Plaintiff Booth, Defendant "stated that Plaintiff Booth was promoting 'fake news.'" (Doc. No. 34 at ¶ 17.) However, the record contains no evidence to support Defendant's accusation that Plaintiff Booth was promoting misinformation or "fake news."

Defendant makes no effort to demonstrate from the evidence that the interactive space associated with the @JohnHMerrill Twitter account bears the hallmarks of a nonpublic forum. Further, Defendant has admitted that at least some of his motivations for blocking Plaintiffs were *not* viewpoint neutral. (Doc. No. 34 at ¶ 1.) Finally, with respect to any arguably viewpoint-neutral, content-based motive for blocking Plaintiffs, Defendant makes no effort to demonstrate that blocking Plaintiffs was "'reasonable in light of the purpose served by the forum.'" *Knight II*, 302 F. Supp. 3d at 575 n.22. Defendant also makes no effort to explain how the purpose of the forum reasonably could have been served by blocking Plaintiffs for tweets Defendant allegedly "deemed to be disruptive or personal attacks" or in response to Plaintiff Fasking allegedly asking repetitive questions.[16] Viewpoint-neutrality alone would not be sufficient to justify excluding Plaintiffs from a nonpublic forum; the reasonableness of the restriction in light of the forum's purpose must also be established, and Defendant has made no attempt to do so. *See Cornelius*, 473 U.S. at 806 (noting that such restrictions must be "reasonable in light of the purpose of the forum").

Defendant also relies on the principle that "speakers can be excluded from a public forum . . . when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius*, 473 U.S. at 800. (Doc. No. 39 at 18.) However, Defendant fails entirely to identify a compelling state interest and

---

[16] In fact, Defendant's arguments on summary judgment undercut any contention that blocking Plaintiffs for asking too many questions or making personal attacks was reasonable in light of the purpose of the forum. As Defendant points out, he is not obligated to read or respond to anyone else's tweets.

he makes no attempt to justify how a compelling state interest would be served by even a viewpoint- or content-neutral decision to block Plaintiffs. He also fails to explain how his decision to block Plaintiffs was "narrowly drawn" to achieve a compelling state interest.

Finally, Defendant cites cases holding that rules or regulations as to the time, place, and manner of speech, even those that incidentally affect some speakers or messages but not others, can be justified if those regulations (1) are content-neutral; (2) are narrowly tailored to serve a significant government interest, and (3) leave ample alternative channels for communication open to the speakers. (Doc. No. 39 at 19.) *Ward*, 491 U.S. at 791. Once more, Defendant focuses solely on his contention that his actions were content-neutral (a contention inconsistent with the undisputed evidence) without identifying a significant government interest or explaining how blocking Plaintiffs was narrowly tailored to serve that interest. Even more fundamentally, Defendant fails to specifically identify any broadly-applicable, content-neutral regulation or policy restricting the time, place, or manner of Twitter users' speech in the interactive space associated with the @JohnHMerrill account, nor has he demonstrated that he blocked Plaintiffs pursuant to any such content-neutral policy or regulation. *Id.* (stating that "[t]he government's purpose is the controlling consideration" and that "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral"). The evidence before the Court contains no indication of a content-neutral blocking policy. The parties stipulated that the @JohnHMerrill account is "accessible to the public at large without regard to political affiliation or any other limiting criteria," that "anyone who wants to follow the [@JohnHMerrill] account can do so," and that "Defendant . . . has not issued any rule or

29

statement purporting to limit (by form or subject matter) the speech of those who reply to his tweets." (Doc. No. 34 at ¶¶ 68-69, 71.) In fact, the only evidence from which to glean Defendant's general policy for blocking social media users indicates a policy that is content- and viewpoint-based.[17]

In sum, the only reasonable inference that can be drawn from the undisputed facts is that Defendant blocked (and continues to block) Plaintiffs from the interactive space associated with the @JohnHMerrill account because of the viewpoints and content expressed in Plaintiffs' tweets. As a matter of law, Defendant's decision to block Plaintiffs cannot be constitutionally justified if that decision is attributable to the state. *See Iancu v. Brunetti*, 204 L. Ed. 2d 714 (2019) (observing "a core postulate of free speech law: [t]he government may not discriminate against speech based on the ideas or opinions it conveys" and stating that "a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment"); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) (explaining that a "content-based prohibition" limiting speech in a designated public forum "must be narrowly drawn to effectuate a compelling state interest"). *But see Manhattan Cmty. Access Corp. v. Halleck*, 204 L. Ed. 2d 405 (2019) ("[T]he Free Speech Clause . . . constrains governmental actors and protects private actors.").

---

[17] Defendant's Deputy Chief of Staff emailed a journalist on Defendant's behalf stating: "From Secretary Merrill: I will continue to use my social media forums the way that I have utilized them in the past. They will not be used by others to express their political views or promote their agendas." (Doc. No. 34 at ¶ 6.) As Defendant points out, this statement does not specifically reference Plaintiffs; at most, it is a statement of Defendant's general policy regarding blocking other users from the @JohnHMerrill account.

**E. Applicability of the Public Forum Doctrine**

The conclusion that Plaintiffs' speech is protected speech is only the beginning of the inquiry. "Even protected speech is not equally permissible in all places and at all times." *Cornelius*, 473 U.S. at 799. Nothing in the First Amendment "requires the state to freely grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id*. 799–800. Recognizing the government's right to "'preserve the property under its control for the use to which it is lawfully dedicated,'" the Supreme Court "has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Id.* (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)).

"Generally speaking, [the Supreme Court] recognizes three types of government-controlled spaces," or public forums: "traditional public forums, designated public forums, and nonpublic forums." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). *But see Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017) ("The Supreme Court has referred to four categories of government fora: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum."). First Amendment protections extend to each type of public forum, and "[t]he extent to which the Government can control access depends on the nature of the relevant forum." *Cornelius*, 473 U.S. at 800. However, in no type of government-controlled forum is viewpoint-based discrimination permitted. *See Mansky*, 138 S. Ct. at 1885; *Matal v. Tam*,

137 S. Ct. 1744, 1763 (2017); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

Plaintiffs contend that this case concerns a designated public forum.[18] Before evaluating that contention, the Court must first define the space that makes up the putative forum and determine whether the space is conducive to being analyzed as a forum at all.

### 1.    Defining the Putative Forum

In defining the scope of a putative forum, it is not enough to simply identify the government property at issue. *Cornelius*, 473 U.S. at 801. Rather, the Supreme Court has "focused on the access sought by the speaker." *Id.* "When speakers seek general access to public property, the forum encompasses that property" in its entirety; however, "[i]n cases in which limited access is sought," the Supreme Court has "taken a more tailored approach

---

[18] In a designated public forum, the state may limit speech based on its content only if the limitation is "content-neutral, . . . narrowly tailored to serve a significant government interest, and leave[s] open ample alternative channels of communication." *Perry Educ. Ass'n*, 460 U.S. at 45. Although the state may not have been required to open the space to expressive activity or "to maintain the open character of the facility," as long as it maintains the space as one for expressive activity, "content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Id.* However, reasonable, content-neutral regulations on the time, place and manner of speech are permissible. *Id.* "In addition, expressive activity in a designated public forum can be limited to a particular class of speakers instead of being opened to the general public;" however, "once the designated public forum has been limited to that particular class, all members of that class must receive general access." *Barrett*, 872 F.3d 1224. Viewpoint-based speech limitations are not allowed in a designated public forum, and any content-based restrictions must satisfy strict scrutiny. *Mansky*, 138 S. Ct. at 1885; *see also Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). ("If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny.").

to ascertaining the perimeters of a forum within the confines of the government property."
*Id*. Moreover, a forum in the First Amendment sense need not be a physical space but can be a "metaphysical" one as well. *See Matal*, 137 S. Ct. at 1763 (holding that First Amendment restrictions apply when government creates a limited public forum, "in either a literal or 'metaphysical' sense"); *Rosenberger*, 515 U.S. at 830 (holding that a university's student activities fund was "a forum more in a metaphysical than in a spatial or geographic sense, but the same [First Amendment] principles are applicable"); *Perry Ed. Assn.*, 460 U.S. at 46–47 (applying forum analysis to a school mail system); *Cornelius*, 473 U.S. at 801 (applying forum analysis to a charitable contribution program); *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017) (recognizing that, in current times, social media is akin to "the modern public square").

Here, Plaintiffs do not seek access to the entirety of the @JohnHMerrill account; they do not want to control the content of the tweets issued from the @JohnHMerrill account or to operate the administrative features Twitter has allotted to Defendant as administrator of the account. Rather, Plaintiffs seek access to the interactive features associated with[19] the @JohnHMerrill account, features that allow any Twitter user to comment on and react to @JohnHMerrill's tweets, reply to them, and interact with other users about them. By blocking Plaintiffs, Defendant has precluded them from accessing those interactive features. Thus, the interactive "space" associated with the @JohnHMerrill

---

[19] The parties stipulate that "[t]his case is about the interactive features of the [@JohnHMerrill] account," not just the initial tweets issued by Defendant while using the account. (Doc. No. 34 at ¶ 73.)

account is the purported forum at issue in this case. *Cf. Davison v. Randall*, 912 F.3d 666, 687 (4th Cir. 2019) (holding that "the interactive component" of an official's social media page constituted a public forum).

### 2. The Interactive Space Associated with the @JohnHMerrill Account Is Intended to Operate as a Space for Expressive Activity by the Twitter-Using Public

Plaintiffs contend that the interactive space associated with the @JohnHMerrill Twitter account is a designated public forum.[20] A designated public forum is property the state has intentionally opened for use by the public as a place for expressive activity. *Perry Educ. Ass'n*, 460 U.S. at 45 (1983); *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017). Defendant argues that the interactive space associated with the @JohnHMerrill Twitter account is not a designated public forum because (1) treating the @JohnHMerrill Twitter account as a designated public forum would be antithetical to the purpose and use of the @JohnHMerrill account and (2) steps were never taken to open the @JohnHMerrill Twitter account to the Twitter-using public for expressive activity. (Doc. No. 39 at 11-17.)

"[W]here the application of forum analysis would lead almost inexorably" to the closing of the space in question or defeat the purpose of the space, "forum analysis is out of place." *Summum*, 555 U.S. at 480; *see also United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 203, 205, 206 (2003) (plurality opinion) (holding that applying public forum

---

[20] Defendant does not argue that the interactive space should be characterized as a different type of forum, such as a limited public forum.

principles to internet access in public libraries would be "out of place" where doing so would be "incompatible with the discretion that public libraries must have to fulfill their traditional missions"); *Arkansas Educ. Television Com'n v. Forbes*, 523 U.S. 666, 674-75 (1998) (holding that "public broadcasting as a general matter does not lend itself to scrutiny under the forum doctrine" because "[c]laims of access under our public forum precedents could obstruct the legitimate purposes of television broadcasters"). Plaintiffs and Defendant recognize that it would be impractical to allow all members of the Twitter-using public to access the official @JohnHMerrill account for the purpose of operating the administrative controls associated with that account or posting, replying, and interacting on behalf of the @JohnHMerrill account. Doing so would rob the @JohnHMerrill account of *its* voice and be incompatible with a key function of the account, which is to communicate information that Defendant wishes to communicate through the @JohnHMerrill account to the general public.

However, that is not the access that Plaintiffs seek in this case. Rather, they seek to be restored to participation in the interactive space associated with the account, in which members of the public discuss, comment upon, reply to, and otherwise react to the tweets of the @JohnHMerrill account. The evidence is undisputed that Defendant did intentionally open that interactive space to the Twitter-using community by creating and maintaining a public Twitter account that would allow the Twitter-using public to directly comment upon, reply to, retweet, and react to the tweets Defendant issued from the @JohnHMerrill account. *Cf. Packingham v. North Carolina*, 137 S. Ct. 1730, 1735-36 (2017) ("On Twitter, users can petition their elected representatives and otherwise engage

with them in a direct manner. . . . In short, social media users employ these [social media] websites to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1997)). Though Defendant had an option to use the administrative controls associated with the @JohnHMerrill account to restrict the interactive space associated with that account to himself and his followers, he did not do so. (Doc. No. 34 at ¶¶ 58-59.)

In fact, the uncontradicted evidence of record demonstrates that public interaction is a key feature of the interactive space associated with the @JohnHMerrill Twitter account, as is shown from (1) the tweets and interactive responses contained in the record, (2) the character of the interactive spaces associated with a public Twitter account, which is known to and purposely utilized by Defendant, [21] and (3) the parties' stipulation that "[p]ublic interaction is a feature of the @JohnHMerrill account." (Doc. No. 34 at ¶ 67.) *Cf. Packingham*, 137 S. Ct. at 1735 (2017) (recognizing that, by its very nature, "social media in particular" serves as a democratic forum for the exchange of views).

---

[21] (*E.g.,* Doc. No. 34 at ¶ 5 ("Defendant . . . has used the @JohnHMerrill account as a channel for communicating and interacting with the public about his administration."); ¶ 21 ("The Twitter platform allows users to . . . republish, quote, and respond to others' messages."); ¶¶ 43-45, 50-52 (describing interactive features of public Twitter accounts and noting that the comment threads associated with a user's tweet "are a large part of what makes Twitter a social media platform"); ¶¶ 34, 58-59, 70 (describing methods by which someone can restrict their account's interactive features to the user and his or her approved followers); ¶ 67 ("Public interaction is a feature of the @JohnHMerrill account."); ¶ 89 ("Defendant . . . uses his Twitter account to interact with the public."); ¶ 90 ("Defendant . . . uses his Twitter account as a channel for communicating and interacting with the public . . . ."); ¶ 90 ("Defendant . . . uses his Twitter account on an almost daily basis for communicating and interacting with the public"); ¶ 95 ("Twitter users sometimes direct questions regarding voting and elections to [Defendant] in his capacity as Secretary of State by tweeting to the @JohnHMerrill account, and [Defendant] sometimes answers those questions using the @JohnHMerrill account.").)

Thus, the Court concludes that treating the interactive space associated with the @JohnHMerrill account as a designated public forum is compatible with a central purpose and function of that space: allowing the public to expressively interact with the @JohnHMerrill account. Further, by maintaining the account as a public account, Defendant did purposefully open that interactive space to the Twitter-using public for the purpose of expressive interaction with the account.

### 3. Whether the Interactive Space Associated with the @JohnHMerrill Account Is Owned or Controlled by the Government

As Defendant points out, a designated public forum is by nature a space owned or controlled by the government. *Barrett*, 872 F.3d at 1224 ("A designated public forum is 'government property that has not traditionally been regarded as a public forum [but] is intentionally opened up for that purpose.'" (quoting *Walker*, 576 U.S. at 216)); *see also U.S. Postal Serv. v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 132 (1981) (recognizing that "the question of whether a particular piece of personal or real property owned or controlled by the government is in fact a 'public forum' may blur at the edges."). The fact that government control over the property is temporary, or that the government does not "own" the property in the sense that it holds title to the property, is not determinative of whether the property is, in fact, sufficiently controlled by the government to make it a forum for First Amendment purposes. *Knight II*, 928 F.3d at 235 (citing *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 547-52 (1975)).

If Defendant controls the @JohnHMerrill account solely as a means for his own expressive activities as a private citizen, it is not a public forum, and he is protected from

government interference in how he chooses to administer that account. [22] *Manhattan Cmty.*

*Access Corp. v. Halleck*, 139 S. Ct. 1921, 1926 (2019) (noting that the Free Speech Clause

"constrains governmental actors and protects private actors"). But if Defendant controls

that account in his capacity as Secretary of State or as a tool of his office such that his

control of the account can fairly be attributed to the state, then the Free Speech clause limits

his ability to use his powers as account administrator to restrict the speech of others in the

interactive space associated with the account. *Id.* Similarly, a § 1983 claim for deprivation

of constitutional rights can only succeed against a defendant who acted "under color of

state law." 42 U.S.C. § 1983. Even state officers cannot be held liable under § 1983 for

actions taken "'in the ambit of their personal pursuits.'" *Myers v. Bowman*, 713 F.3d 1319,

1329 (11th Cir. 2013) (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)).

Therefore, for Plaintiffs to prevail in this case, they must demonstrate that

Defendant's actions in blocking them are fairly attributable to the state because those

---

[22] In support of his contention that his account is private and not controlled by the government,
Defendant argues that he has no control over whether Plaintiffs can access and interact with other
users' pages, and that Twitter, not the government, sets the terms for such access and interaction.
(Doc. No. 39 at 6-7, 13.) Defendant's argument is belied by the record, which demonstrates without
contradiction that, as account administrator, Defendant, not Twitter, is the sole, unilateral, and
final arbiter of whether users are specifically blocked from the @JohnHMerrill account and the
interactive space associated with it; whether that control is governmental or private in nature
remains to be determined. The record contains no evidence that Twitter blocks users from selective
pages of other users or arbitrates appeals from users' decisions to block others; whether Twitter
may separately exercise access control by banning users from the platform entirely is neither
relevant nor addressed by any of the evidence before the Court. *Cf. Knight II*, 928 F.3d at 236
("[T]he fact that any Twitter user can block another account does not mean that the [government
official] somehow becomes a private person when he does so.").

actions were done under color of state law.[23] *See Charudattan v. Darnell*, 834 F. App'x 477, 481-82 (11th Cir. 2020) (considering whether a sheriff "acted under color of state law" and was thus liable under § 1983 for First Amendment violations when she deleted the plaintiff's comments and banned him from the Facebook[24] page of her former political campaign); *Attwood v. Clemons*, 818 F. App'x 863, 867 (11th Cir. 2020) (stating, in dicta, that if a state representative was "acting in his official capacity when he operate[d] these social media accounts as an extension of his role in state office," then the social media accounts "may" be a public forum, "and if so, [the representative] may not be allowed to exclude others based on their views" by blocking them); *see also Garnier v. O'Conner-Ratcliff*, 41 F.4th 1158, 1163 (9th Cir. July 27, 2022) ("[W]e hold that . . . the [school district board's trustees] have acted under the color of state law by using their social media pages as public fora in carrying out their official duties."); *Lindke v. Freed*, 37 F.4th 1199 (6th Cir. June 27, 2022) (considering, in a case alleging violation of the Free Speech

---

[23] For purposes of this case, whether Defendant was acting under color of state law for purposes of § 1983 and whether he engaged in state action in operating the @JohnHMerrill account and in blocking Plaintiffs for purposes of First and Fourteenth Amendment analysis are essentially different expressions of the same basic requirement of government control. Therefore, the Court will use the concepts interchangeably as it deems appropriate. *See Knight I*, 302 F. Supp. 3d 541, 567-68 (S.D.N.Y. 2018) (noting that "the standards for whether an action was taken 'under color of state law' and for whether an action constitutes 'state action' are identical" and that "the requirement of state action in the forum context is not usually analyzed separately (either in general or under the *West* [*v. Atkins*, 487 U.S. 42, 49 (1988)] standard specifically) from the government control-or-ownership requirement" of the public forum analysis); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982) ("[I]n a § 1983 action brought against a state official, the statutory requirement of action "under color of state law" and the "state action" requirement of the Fourteenth Amendment are identical.").

[24] Facebook is a social media platform. For a discussion of Facebook's interactive features in comparison to Twitter's, see *Garnier*, 41 F.4th at 1163-64.

Clause, whether a public official had operated his social media account in a manner that was fairly attributable to the state); *Swanson v. Griffin*, No. 2:20-CV-00496-KG-GJF, 2022 WL 570079, at *3 (10th Cir. February 25, 2022) ("[T]he First Amendment protects against viewpoint discrimination by the government in government-created forums on social media."), *cert. denied*, 143 S.Ct. 100; *Campbell v. Reisch*, 986 F.3d 822 (8th Cir. 2021) ("The question this case presents is whether [the defendant] acted under color of state law when she blocked [the plaintiff] on Twitter."); *Knight II*, 928 F.3d at 236 (holding that, while President of the United States, the defendant operated his previously-private Twitter account in his presidential capacity and thus unconstitutionally "excluded the Individual Plaintiffs from government–controlled property when he used the blocking function of the [Twitter account] to exclude disfavored voices"); *Davison*, 912 F.3d at 681-87 (holding that a public official acted unconstitutionally in her official capacity when blocking the plaintiff from commenting on a Facebook page the official had created).

The Supreme Court has yet to consider whether and under what circumstances a formerly private social media page can be said to have been converted to state use. The Eleventh Circuit has not issued any controlling authority on the question. However, it is clear from the relevant case law that deciding whether an official is acting in their private capacity or under color of state law in administering a social media page is inherently a fact-based inquiry. *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001) ("Whether a government employee is acting under color of law is not always an easy call, and the color of law analysis inevitably requires that we engage in line drawing."); *Almand v. DeKalb Cnty., Ga.*, 103 F.3d 1510, 1515 (11th Cir. 1997) ("Our color-of-state-law

conclusion requires us to engage in line drawing. But, in the words of Justice Holmes, 'the great body of the law consists in drawing such lines.'" (quoting *Schlesinger v. Wisconsin*, 270 U.S. 230, 241 (1926) (Holmes, J., dissenting)). "It is only through a process of 'sifting facts and weighing circumstances' that [courts] arrive at a correct determination." *Griffin*, 261 F.3d 1303 (quoting *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000)).

For example, in *Charudattan*, 834 F. App'x at 481-82, the Eleventh Circuit considered whether a sheriff was acting in her personal or official capacity in banning the plaintiff from commenting on her campaign's Facebook page, which the sheriff had created before taking office. Noting that "[t]here is not a clear distinction between public and private activity," but that "state action may be found if . . . there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself,'" *id.* at 481, the court considered a variety of factors before concluding that the Facebook page in question was a private page not subject to the First Amendment's prohibition on government abridgment of free speech. The sheriff had created the account during her election campaign and two off-duty sheriff's office employees[25] monitored the page on their own private time. *Id.* at 479. The page included a disclaimer stating it was a political ad for the sheriff's campaign. *Id.* Though the sheriff changed the name of the Facebook page from "Reelect Sadie Darnell" to "Sheriff Sadie Darnell" sometime after she was elected, she did not post to the account or authorize posts

---

[25] The court did not give much weight to the fact that two off-duty deputies monitored the page because the plaintiff submitted no evidence to support his assertion that the deputies were not true volunteers, but "had to" manage the page due to their employment. *Charudattan*, 834 F. App'x at 482.

to the account after her election. *Id.* In determining that the sheriff's control of the account was not attributable to the state, the court considered that the account was privately owned, did not contain posts on behalf of the sheriff's office, and was used exclusively as a political platform for the sheriff's re-election campaign. *Id.* at 481-82. The court also noted that the page did not include the sheriff's official title at the time of the alleged violation and was not categorized as belonging to a government official. *Id.* at 482.

By contrast, in *Attwood*, 818 F. App'x at 867, the Eleventh Circuit stated in dicta that certain facts, "taken as true and viewed in the light most favorable to" the plaintiff, indicated that a Florida state representative who had blocked the plaintiff on Twitter and Facebook was "acting in his official capacity when he operate[d] these social media accounts as an extension of his role in state office." *Id.* Those facts included (1) that the representative "adorn[ed] his social media accounts with all the trappings of his state office, (2) that "[h]e use[d] the accounts to make official statements, to share information about legislative activities and government functions, and to communicate with the general public," (3) that [h]e direct[ed] his [social media] followers to connect with him further through his official Florida House of Representatives contact information," and (4) that "[t]he posts and comments . . . [were] maintained according to the state's public records laws and . . . made available for public inspection." *Id.*

The facts of this case do not fit neatly into the pattern of *Charudattan*, in which the defendant did not even post to the social media account at issue after her election, or *Attwood*, in which even the State of Florida itself treated the defendant's social media posts as official state records. On the whole, the facts of this case more closely track those in

*Attwood*, but the facts here are different enough that the dicta in the Eleventh Circuit's unpublished *Attwood* decision does not, as a matter of law, mean that Defendant operated the @JohnHMerrill account in his capacity as Alabama Secretary of State. Rather, as in *Attwood* and as suggested by *Charudattan*, the Court must look at the facts as a whole and the inferences to be drawn therefrom to determine if Defendant was, in fact, acting under color of state law. As explained more fully below, however, though the evidence of record is almost entirely undisputed, those undisputed facts give rise to competing sets of reasonable inferences regarding the capacity in which Defendant operated the account when he blocked Plaintiffs. Therefore, it is not possible to determine at this time, as a matter of law, whether Defendant acted under color of state law, and summary judgment is not appropriate on this issue. *See United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (noting that cross-motions for summary judgment warrant summary judgment only if one of the parties is entitled to judgment as a matter of law on facts that are not genuinely in dispute, and that, "if reasonable minds differ on the inferences arising from undisputed facts, summary judgment should be denied").

In support of their contention that Defendant was operating the @JohnHMerrill account on behalf of the state, Plaintiffs cite *Knight II*. In *Knight II*, the Second Circuit held that, while President of the United States, Donald Trump operated his Twitter account in his official capacity, and thus his blocking of the plaintiffs could be attributed to the government, because (1) "the [a]ccount [was] presented by the President and the White House staff as belonging to, and operated by, the President"; (2) after becoming President, Donald Trump "used the [a]ccount on almost a daily basis as a channel for communicating

and interacting with the public about his administration," including announcing official policies and engaging with foreign leaders; and (3) Donald Trump used the public's engagement with the interactive features of his account to understand and evaluate the public's reaction to his own acts and statements. *Knight II*, 928 F.3d at 235-36 (citations and internal quotation marks omitted). The court concluded that, "[i]n sum, since he took office, [Donald Trump] has consistently used the [a]ccount as an important tool of governance and executive outreach." *Id.* at 236.

The Second Circuit's approach in *Knight II* is not inconsistent with *Charudattan* and *Attwood*. *See Charudattan*, 834 F. App'x at 481-482 (holding that there was no state action where both the presentation and use of the social media account were as a private individual's campaign re-election platform and the account neither contained posts on behalf of the defendant's office nor presented itself as belonging to a government official); *Attwood*, 818 F. App'x at 863 (noting, in dicta, that government action could be inferred from the evidence, including evidence that the defendant's social media account was "adorn[ed] with the trappings" of the defendant's state office, the account was used to make official statements and share information about the defendant's official duties with the public, and the state itself treated the defendant's social media account as a public record).

Like the Second Circuit in *Knight II*, other courts have similarly held that government control of a forum is dependent on whether the facts as a whole indicate that the defendant was presenting his or her account as an official one, whether the government indicated that it regarded the account as official, and/or whether the defendant used the account as a tool for carrying out and communicating with the public about his or her

official duties. In *Garnier*, 41 F.4th at 1171-72, [26] the Ninth Circuit found state action where (1) the defendants "'purport[ed] . . . to act in the performance of [their] official duties through the use of their social media pages," (2) the defendants invoked their governmental status in using their social media pages to influence and engage the public, (3) the defendants managed their social media in a manner that "'related in some meaningful way' to their 'governmental status' and 'to the performance of [their] duties,'" and (4) the defendants' specific actions in blocking the plaintiffs were linked to events arising out of the defendants' official status. Noting that the existence of state action is inherently a fact-based inquiry that involves sifting evidence and weighing circumstances, the Ninth Circuit stated that "courts should look to considerations such as 'how the official describes and uses the account,' 'to whom features of the account are made available,' and how members of the public and government officials 'regard and treat the account.'" *Id.* at 1173 (quoting *Knight II*, 928 F.3d at 236). *Cf. Davison*, 912 F. 3d at 680-81 (holding that the interactive component of a public official's Facebook page was a public forum in part because the official created the page to further her official duties and as a tool of governance, swathed the page in the trappings of her office and used the page to provide the public with information on her official activities, and where a private citizen could not have created and used the page in such a manner).

---

[26] At the time the parties filed their summary judgment briefs, *Garnier* had not yet been decided by the Ninth Circuit. Rather, in their briefs, the parties instead discussed the United States District Court's orders in the case, which the Ninth Circuit subsequently affirmed. *See Garnier v. O'Connor-Ratcliff*, 513 F. Supp. 3d 1229, 1232 (S.D. Cal. 2021), *aff'd*, 41 F.4th 1158 (9th Cir. 2022).

In *Lindke v. Freed*, however, the Sixth Circuit applied a slightly different test for ascertaining government action: whether the defendant official operated the social medial page as part of his or her actual or apparent duties, and whether the defendant official's operation of the page "couldn't happen in the same way" without the authority the official held by virtue of his or her office. 37 F.4th at 1203. In so doing, the Sixth Circuit "parted ways" with other circuits and declined to "examine a [social media] page's appearance or purpose" for the trappings of the official's office. *Id*. at 1206. Instead, the Sixth Circuit chose to focus on (1) whether the social media page was used to fulfill an actual or apparent duty of the defendant's office and (2) whether the defendant used their governmental authority to operate the page by, for example, using state employees or resources to maintain the page. *Id.* at 1206-07.

In *Campbell*, 986 F.3d at 825, the Eighth Circuit did not choose a side between an approach similar to the one the Sixth Circuit would eventually take in *Lindke* or the approach taken in *Knight II*. However, in its analysis, the Eighth Circuit chose to put little weight on whether the account was presented as belonging to a government official, noting that the "trappings" of a campaign's social media account were not very helpful in determining whether that account had been converted to a tool of the candidate's office after she was elected. *Id*. at 827. Instead, the court focused primarily on whether the account was used as a tool of the official's government office and found the page to be a private one because, "in the main," it was used to "promote [the defendant] and position her for more electoral success down the road." *Id*. at 826. The court noted that even if "occasional stray messages . . . might conceivably be characterized as conducting the public's

business," that would not have been enough to convert what had been originally conceived as a campaign page into one that could be fairly attributable to the state. *Id.* at 826-27. Moreover, while the Eighth Circuit did not expressly consider whether the facts indicated that the defendant's operation of the social media page "couldn't happen in the same way" without the authority the official held by virtue of the defendant's office, *Lindke*, 37 F.4th at 1203, the Eighth Circuit did note that a number of factors touted by the plaintiff as indicative of governmental authority were just as consistent with a private individual's management of a social media page as part of her political campaign. *Campbell*, 986 F.3d at 826-27. Thus, *Campbell* is at least consistent with *Lindke*, even though the Eighth Circuit did not find it necessary to choose between the two approaches.

Similarly, at this juncture, it is unnecessary to choose which legal test to apply for determining when a private individual's social media account has been converted into one that is fairly attributable to the state.[27] All the prevailing approaches take into serious consideration whether the state official uses the social media account as a tool for carrying

---

[27] Defendant does not dispute that the *Knight II* test was a valid test; he only argues that, even if *Knight II* applied, he should nevertheless be granted summary judgment because, unlike in *Knight II*, his blocking of Plaintiffs was viewpoint-neutral and a valid content-based restriction that satisfied strict scrutiny – arguments that the Court addresses elsewhere in this Memorandum Opinion and Order. (Doc. No. 39 at 17-20.) However, the Court declines to expressly adopt *Knight II* at this time because doing so is unnecessary at this juncture and because case law developed rapidly after *Knight II* was decided and after summary judgment briefing came under submission. Since that time, the Circuit split emerged, and it remains to be seen whether the United States Supreme Court will soon take up the issue. As of this writing, the United States Supreme Court has not ruled on pending petitions for writ of certiorari in *Garnier* and *Linkdke*. For these reasons, the Court will allow the parties further opportunity to brief the issue before deciding which test to apply in this case.

out the actual or apparent duties of their office, and, in this case, competing inferences can be drawn from the evidence with respect to that issue.

For purposes of this Memorandum Opinion and Order, the Court notes that the Secretary of State's duties include serving as Alabama's "chief elections official" who "shall provide uniform guidance for election activities." Ala. Code 1975 § 17-1-3 (a).[28] It is undisputed that Defendant "operates and oversees the operation of" the @JohnHMerrill Twitter account," that the account's tag line is "Representing the People of Alabama as their 53rd Secretary of State," and that Defendant uses the account "as a channel for communicating and interacting with the public about his administration" (though, "on occasion," he posts about "other issues not directly related to official government business"). (Doc. No. 34 at ¶¶ 3, 5, 31.) He uses the account "to announce, describe, and defend his policies," to "announce official decisions and government business," "to publicize visits to his constituents," for unspecified "fund-raising events," for "political events," "to announce official Secretary of State decisions and policies before those

---

[28] The parties have not provided the Court with applicable law defining the duties of the Alabama Secretary of State; they all seem to assume that the Court is familiar with the Secretary of State's role as Alabama's chief elections official. The Court takes judicial notice that the Alabama Constitution vests the Secretary of State with certain record-keeping duties as well as the responsibility to "perform such other duties as required by law." ALA. CONST. OF 1901 art. V. § 134. In turn, Alabama law provides that "[t]he Secretary of State is the chief elections official in the state and shall provide uniform guidance for election activities." Ala. Code 1975 § 17-1-3(a). *See Patel v. United States Att'y Gen.*, 971 F.3d 1258, 1264 n.3 (11th Cir. 2020) ("Federal courts . . . must take judicial notice of state law."). Though judicial notice of the Alabama Secretary of State's authority as the state's chief elections official suffices for resolution of the currently-pending cross-motions for summary judgment, the Court will not do the parties' legal research for them. At trial and in any briefing prior to trial, the parties will be expected to more specifically set forth the legal duties of the Alabama Secretary of State and explain how, if at all, those duties relate to Defendant's Twitter account and his decision to block Plaintiffs.

decisions and policies are announced through other official channels," and, "on an almost daily basis," for "communicating and interacting with the public about the administration of the Alabama Office of the Secretary of State among other issues of interest to him or his followers." (*Id*. at ¶¶ 83-90.)

The @JohnHMerrill Twitter account is replete with posts discussing Defendant's own official duties regarding election integrity, voting, voter registration, ballots, and elections; his efforts to assist members of the public with voter registration drives, to provide county elections officials with uniform guidance, and to ensure election integrity; and his own official acts, interviews, and public appearances regarding those matters. (*Id*. at ¶¶ 28, 82; Doc. No. 37-1 at ¶¶ 4.b.-c., 4.f., 4.i.-j.) The @JohnHMerrill "account contains photographs of [Defendant] interacting with the public as Secretary of State, announcing decisions as Secretary of State, holding press conferences as Secretary of State in the office of the Secretary of State, and meeting with many public officials in the performance of his official duties as Secretary of State." (Doc. No. 34 at ¶ 82.) For example, his timeline includes a tweet of a photo of himself using a cell phone in his office, accompanied by the following statement: "I was delighted to be interviewed by @ABC today concerning our plan to utilize the new resources available to us through the Help America Vote Act [!] It is important that these resources be utilized to benefit all citizens in the area of election security!" (Doc. No. 34 at ¶ 8.)

Defendant's tweets also include posts that, viewed in the light most favorable to Plaintiffs, appear to be directed at influencing the public to register to vote in a timely manner, giving the public confidence that Alabama voting procedures are secure,

dissuading the public from believing a viral video about election hacking, encouraging the public to view a television interview in which Defendant "discuss[ed] elections and election administration," and encouraging county elections officials in their work. (*Id.* at ¶¶ 28, 33, 97; Doc. No. 37-1 at ¶¶ 4.f.-g, 4.i.) Defendant also tweeted an accusation at a former mayor, accusing him of being "a criminal" and stating that "*[w]e* will continue to work to uncover all evidence that is available in your case and *we* will hunt you down and *we* will prosecute you to the fullest extent of the law," which, viewed in the light most favorable to Plaintiffs, purports to be a statement made on behalf of the state, as private citizens are not authorized to prosecute criminal cases. (Doc. No. 37-1 at ¶ 4.e (emphasis added).)

Defendant has also used the @JohnHMerrill account to respond directly to questions from the public concerning issues related to voting and elections. (Doc. No. 34 at ¶ 95, Doc. No. 37-1 at ¶ 4.c.) In fact, in the specific instances in which Defendant blocked Plaintiffs from the @JohnHMerrill account, each Plaintiff was attempting to discuss with Defendant matters pertaining to voting in Alabama elections, voter status, and/or Defendant's official activities. [29]

---

[29] Plaintiffs Fasking, Hicks, and Booth were blocked after posting tweets discussing crossover voting, Defendant's invitation to ceremonies related to the 51st Anniversary of Bloody Sunday, and a typographical error on a ballot, respectively. (Doc. No. 34 at ¶¶ 10-17.) The Court takes judicial notice that "Bloody Sunday" refers to an attack in Selma, Alabama, on a 1965 voting rights march that catalyzed support for passage of the Voting Rights Act of 1965, 52 U.S.C. § 10301, *et seq.* John Lewis, *Reflections on Judge Frank M. Johnson, Jr.*, 109 YALE L.J. 1253, 1255-56 (2000). The purpose of the march was "to dramatize to the nation and to the world that people of color wanted to register to vote." John Robert Lewis, *The King Legacy*, 30 VT. L. REV. 349, 355 (2006); *see Williams v. Wallace*, 240 F. Supp. 100 (M.D. Ala. 1965) (Johnson, J.) (describing the attack on the marchers, discussing the march and its purpose to petition the government for voting rights, and ordering Alabama state officials to provide police protection to the marchers); *see also United*

Viewed in the light most favorable to Plaintiffs, it could reasonably be inferred from the above facts that Defendant used the @JohnHMerrill account in his official capacity to carry out his duties as Alabama's chief elections official, including "provid[ing] uniform guidance for election activities." Ala. Code 1975 § 17-1-3 (a). On the other hand, taken in the light most favorable to Defendant, and on the extremely limited record currently before the Court, it could be inferred that the @JohnHMerrill Twitter account serves primarily as a tool for Defendant to promote himself and his career as a politician.[30] His Twitter page, which, again, contains the tagline, "Representing the People of Alabama as their 53rd Secretary of State," prominently displays smiling, posed photos of Defendant's family and himself, photos of the kind one normally encounters on the unsolicited postcards many politicians mail out to seek voter support. (Doc. No. 34 at ¶ 31.) Defendant created the account prior to becoming Secretary of State,[31] and he occasionally uses the account to

---

*States v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) ("A court may take judicial notice of its own records."); Jack Bass, *The Selma March and the Judge Who Made It Happen*, 67 ALA. L. REV. 537, 537 (2015).

[30] Defendant suggests the court should take into consideration that no state law authorizes him to operate the @JohnHMerrill account. (Doc. No. 39 at 6.) The Court does not take that factor into consideration at this time because (1) while no law authorizes Defendant to have such an account, there is no evidence of a law prohibiting it and (2) Defendant is the Secretary of State in a "uniquely prominent constitutional position" (Doc. No. 39 at 5) with all the powers that position entails, not a low-level State Department employee with limited ability to speak unilaterally on behalf of the Department of State through any chosen form of media. Moreover, even if a government official engages in an action that he is not specifically empowered to do by state law, this does not necessarily mean he is not acting in his official capacity.

[31] Defendant argues the fact that he created the account before becoming Secretary of State and the fact that the account will not remain in possession of the person who succeeds him as Secretary of State together prove that the account is not an official one. However, this fact is not necessarily determinative, since private property can be placed under government control for use as a public forum. Otherwise, the state could make an end run around the requirements of the First

post about matters unrelated to his official duties. (*Id.* at ¶¶ 3-5.) As noted, among other things, the account is used to publicize visits to constituents and for unspecified "fund-raising events" and "political events." (*Id.* at ¶¶ 85-87.) The record contains some of Defendant's tweets that, viewed in the light most favorable to Defendant, are not clearly related to Defendant's duties as Secretary of State.[32] He occasionally engages with Twitter users in a clearly partisan manner, answering statements from Twitter users who direct

---

Amendment by using private property that had been ceded to its temporary control for use as a forum for public expressive activity. *See*, *e.g.*, *Garnier*, 41 F.4th at 1164 (considering whether defendants acted under color of state law regarding social media accounts that were created as campaign pages and subsequently used for posting about government business); *Lindke*, 37 F.4th 1199 (considering whether an official acted under color of state law in using a social media account that he created prior to becoming a government official); *Campbell*, 986 F.3d at 826 ("A private account can turn into a governmental one if it becomes an organ of official business, but that is not what happened here"); *Charudattan*, 834 F. App'x at 481-82 (considering a number of factors to determine if a sheriff had converted her former campaign page to an official one); *see also Cornelius*, 473 U.S. at 801 (stating, in dicta, that "a speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns"). *Cf. Mech*, 806 F.3d at 1074-75 (recognizing that, in certain contexts, the government can appropriate the speech of private individuals as its own).

[32] One tweet, attributed to "AL's Secretary of State," contains a statement about whether dodgeball and kickball should be played in Alabama elementary and high schools. (Doc. No. 34 at ¶ 28.) Some of the posts tout Defendant's public speaking engagements without expressly indicating a connection to his official duties, such as a speech to the graduates of the Cullman Citizens Academy at Temple Baptist Church in Cullman, which was coordinated by the Cullman Sheriff's Office. (*Id.* at ¶ 31.) Another tweet states, "I was honored to visit with and speak to the members of the Alabama Sheriffs Association at their annual [s]ummer [c]onference today at the Perdido Beach Resort in Orange Beach in Baldwin County!" (Doc. No. 37-1 at ¶ 4.d.) In yet another tweet, Defendant remarks: "I enjoyed speaking to the Alabama Independent Automobile Dealers Association this morning at the Hilton in Pensacola!" (Doc. No. 37-1 at ¶ 4a.)

The record also contains a reply tweet by Defendant that simply states: "Let me get this straight, you are a guy, who paints his fingernails, and you refer to me as a loser . . . . SMH." (Doc. No. 34 at ¶ 32 (sic).) No context is given for this statement, and, on its face, the reply tweet gives no indication regarding the topic of the conversation from which it was taken. Thus, on this record, it is not possible to tell whether the reply tweet denigrating someone's cosmetic choice has anything to do with Defendant's work as Secretary of State.

partisan criticism and remarks at him; in one such exchange he made a statement that a Twitter user commented was "not befitting of a state elected official." (*See*, *e.g.*, Doc. No. 34 at ¶ 9.) Another of Defendant's tweets states, "Alabama is working again thanks to @GovernorKayIvey and the Republican legislature. Vote Republican in November and keep the progress going." (Doc. No. 34 at ¶ 40.) Defendant touted his speech on election integrity made "to the National Republican Lawyers' Association at their Election Law Seminar in Charlotte, North Carolina!" (Doc. No. 37-1 at ¶ 4.j.)

Against the background of these tweets and in context of the entire account, viewed in the light most favorable to Defendant, Defendant's responses to constituents' questions about voting, as contained in the limited summary judgment record, could be likened to answering voters' questions while on the campaign trial rather than in a public forum curated by the Secretary of State in his official capacity on behalf of Alabama's State Department. From that perspective, many of the tweets about Defendant's official duties could be taken as attempts to tout to voters his record as a politician and his official appearances and accomplishments.

Considering the competing inferences to be drawn from this record, at this time, the Court cannot conclude as a matter of law whether Defendant primarily used the @JohnHMerrill account as a tool of governance or for carrying out his official duties, or mainly as a means of furthering his personal political career.[33] Thus, it is not possible at

---

[33] This is not to say that the weight of the evidence is roughly in equipoise. It is to say that, because reasonable minds could differ on the inferences to be drawn from the evidence, the Court will not engage in weighing the evidence at all on summary judgment.

this time to consider whether Defendant used the account as a tool of his administration alongside any of the other factors considered by various courts, including whether the account bears the trappings of Defendant's office, whether the Alabama State Department gives the public the impression that the @JohnHMerrill account is an official account of the Secretary of State or treats it as such, and whether Defendant uses the account to inform the public about the official matters of his office. Accordingly, the Court will pretermit discussion of the evidence as it pertains to other factors courts have considered in determining whether a state official acts in his official capacity in the administration of a social media account.

Therefore, at this time, neither party is entitled to judgment as a matter of law with respect to whether Defendant operated the @JohnHMerrill account under color of state law. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict.")

Further, the Court concludes that, after the close of discovery, the parties should be allowed one more opportunity for briefing whether Defendant's decision to block Plaintiffs can be fairly attributed to the state and what legal test should be used in deciding that question. Though the expedient resolution of this case is of paramount concern, additional summary judgment briefing on the issue is appropriate because of (1) the necessity for a bench trial on the issue, (2) the rapid development of the law and the emergence of a circuit split on the issue that occurred after the current cross-motions came under submission, (3)

the current paucity of controlling Eleventh Circuit case law on the issue, and (4) the potential for discovery to bring additional pertinent facts to light.

## F.    Remaining Claims

In addition to their claim that Defendant violated their freedom of speech by restricting their ability to participate in a public forum, Plaintiffs also allege Defendant unconstitutionally restricted their ability to access official statements of the Alabama Secretary of State made through the @JohnHMerrill Twitter account, and that Defendant unconstitutionally restricted their ability to petition the government by interacting with the @JohnHMerrill account. (Doc. No. 1 at ¶¶ 50-51.)

In his summary judgment motion, Defendant specifically addresses Plaintiffs' claims for unconstitutional interference in the right to access his tweets and for unconstitutional interference in the right to petition the Government. (Doc. No. 39 at 8-11, 16-17.) *See* Fed. R. Civ. P. 56(a) (providing that parties "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought."). In response, Plaintiffs do not defend those two claims or attempt to reframe them as First Amendment retaliation claims. Rather, Plaintiffs make clear that this case is solely about vindicating Defendant's alleged unconstitutional restriction on their right to participate in a putative public forum. (Doc. No. 40 at 18-20.)

Defendant argues that Plaintiffs are still able to view his tweets if they sign out of Twitter and thus have not been unconstitutionally restricted from accessing his Twitter statements. In response, Plaintiffs clarify that the conduct for which they seek redress is the unconstitutional restriction on their ability to interact with Defendant's tweets, not a

restriction on their right to view them. (*See* Doc. No. 40 at 19-20 ("[W]hether or not the blocked users are still able to view [Defendant]'s tweets in some manner, they are prevented from interacting directly with those tweets in the same way as other Twitter users, and '[n]o more is needed to violate the Constitution.'" (quoting *Knight I*, 302 F. Supp. 3d at 577)).)

Defendant also argues that Plaintiffs have no right to petition the government by interacting with @JohnHMerrill tweets. In response, Plaintiffs do not argue that their constitutional right to petition the government has been violated. Plaintiffs concede that they have no right to expect Defendant to read or respond to their Twitter activity; they even go so far as to recommend that he "mute" their accounts so that he does not have to see their comments and responses while they participate in the interactive space associated with the @JohnHMerrill account. (Doc. No. 40 at 18-19.) Plaintiffs clearly indicate that the real harm for which they seek redress is not so much the ability to petition the Secretary of State directly by interacting with the @JohnHMerrill Twitter account, but the ability to participate with the larger public in the interactive space associated with the @JohnHMerrill account. (*See* Doc. No. 40 at 18 ("[Defendant] confuses an obligation on his part to listen to a Twitter user, which he rightly points out does not exist, with the First Amendment right of the Twitter user to participate in the interactive space associated with the tweets and replies.").

Defendant has carried his initial summary judgment burden to demonstrate that, in light of the undisputed facts, he is entitled to judgment as a matter of law on Plaintiffs' remaining claims. By focusing exclusively on their right to access a public forum without

defending their remaining claims in the face of Defendant's summary judgment arguments, Plaintiffs have abandoned those remaining claims and waived their opportunity to respond further. Moreover, in the parties' Joint Motion to Submit Case, the parties represented that "briefing is complete in this matter and the case can be decided on the current record." (Doc. No. 51 at ¶ 13.) It therefore appears that Plaintiffs have intentionally abandoned all claims except for the sole claim Plaintiffs briefed on summary judgment.

Hence, Defendant is entitled to judgment as a matter of law dismissing Plaintiffs' claims that he unconstitutionally interfered with their right to access his tweets and that he unconstitutionally interfered with their right to petition the government. *Celotex*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."); *see also Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). *Cf. T.R. v. Lamar Cnty. Bd. of Educ.*, 25 F.4th 877, 884 (11th Cir. 2022) (holding that appellant could not raise an argument on appeal because she had waived the issue by not specifically opposing Defendant's summary judgment argument on the issue when the matter was before the district court).

## VII.   CONCLUSION

Accordingly, it is hereby ORDERED as follows:

1.      Plaintiffs' motion for summary judgment (Doc. No. 37) is GRANTED in part and DENIED in part in that the Court concludes and DECLARES as follows:

(a)      Expression by Plaintiffs and other members of the public in the interactive space associated with Defendant's @JohnHMerrill account is not government speech;

(b)      If Defendant acted under color of state law in blocking Plaintiffs from the @JohnHMerrill account, his blocking of Plaintiffs violated the Free Speech Clause; and

(c)      In all other respects, Plaintiffs' motion for summary judgment is DENIED without prejudice to file a new motion for summary judgment at the close of discovery on the sole remaining issue in this case.

2.      Defendant's renewed motion for summary judgment (Doc. No. 39) is GRANTED in part as to Plaintiffs' claims for unconstitutional restriction on their right to access the @JohnHMerrill tweets and for unconstitutional restriction on their right to petition the government. In all other respects, Defendant's renewed motion for summary judgment (Doc. No. 39) is DENIED without prejudice to file a new motion for summary judgment at the close of discovery on the sole remaining issue in this case.

3.      Plaintiffs' claim against Defendant for unconstitutional restriction on their right to access the @JohnHMerrill tweets is DISMISSED with prejudice;

4.      Plaintiffs' claim against Defendant for unconstitutional restriction on their right to petition the Government by interacting with the @JohnHMerrill account is DISMISSED with prejudice;

5.      The sole remaining issue in this case is whether, in blocking Plaintiffs from accessing the interactive space associated with the @JohnHMerrill account, Defendant engaged in government action, acted under color of state law, and engaged in conduct that is fairly attributable to the state.

6.      This case is SET for a scheduling conference at 9:00 a.m. on February 15, 2023 in Courtroom 4B, Frank M. Johnson, Jr. United States Courthouse Complex, One Church Street, Montgomery, Alabama.

DONE this 10th day of January, 2023.


_____
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE